WR-40,339-08
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 6/4/2015 12:13:28 PM
Accepted 6/5/2015 9:23:58 AM
ABEL ACOSTA
CLERK

EX PARTE BRIAN EDWARD DAVIS

WRIT NO. 40,339-08

IN THE COURT OF CRIMINAL APPEALS

AT

AUSTIN, TEXAS

RECEIVED
COURT OF CRIMINAL APPEALS
6/5/2015
ABEL ACOSTA, CLERK

Cause No. 616522-H[1]

| | | |
|---|---|---|
| EX PARTE | § | IN THE 230th DISTRICT COURT |
| | § | OF |
| BRIAN EDWARD DAVIS, Applicant | § | HARRIS COUNTY, TEXAS |

## STATE'S MOTION TO DISMISS APPLICANT'S SUBSEQUENT APPLICATION FOR WRIT OF HABEAS CORPUS

The State of Texas, by and through its Assistant District Attorney for Harris County, files this, its Motion to Dismiss Applicant's Subsequent Application for Writ of Habeas Corpus, cause number 616522-H, for failure to meet the requirements of TEX. CODE CRIM. PROC. art. 11.071, § 5, and would show the following:

---

[1] This is the applicant's subsequent writ of habeas corpus filed after his new punishment hearing; however, it is the applicant's eighth writ of habeas corpus in cause no. 616522, so, for purposes of the Harris County District Clerk's Office, the applicant's instant, subsequent writ is labeled 616522-H.

1

# I. PROCEDURAL HISTORY

The applicant is confined pursuant to the judgment and sentence of the 230TH District Court of Harris County, Texas, in cause number 616522, wherein the applicant was originally convicted by a jury for the felony offense of capital murder and assessed the death penalty on June 16, 1992. On January 7, 1998, the Court of Criminal Appeals affirmed the applicant's 1992 capital murder conviction in a published opinion. *Davis v. State,* 961 S.W.2d 156 (Tex. Crim. App. 1998).

After the applicant's 1992 conviction, the Court of Criminal Appeals denied the applicant's initial application for writ of habeas corpus, dismissed the applicant's second, third, and fourth applications, denied his fifth application, but granted relief in his sixth application and ordered a new punishment hearing. *See Ex parte Davis,* No. WR-40,339-01 (Tex. Crim. App. Mar. 10, 1999)(not designated for publication); *Ex parte Davis,* No. WR-40,339-02 (Tex. Crim. App. Sept. 13, 2000)(not designated for publication); *Ex parte Davis,* No. WR-40,339-03 (Tex. Crim. App. April 29, 2002)(not designated for publication); *Ex parte Davis,* No. WR-40,339-04 (Tex. Crim. App. May 7, 2002)(not designated for publication); *Ex parte Davis,* No. WR-40,399-05 (Tex. Crim. App. Mar. 29, 2006)(not designated for publication); *Ex parte Davis,* No. AP-76,263 (Tex. Crim. App. Nov. 18, 2009)(not designated for publication).

On March 9, 2011, the applicant was again sentenced to death by lethal injection after the jury affirmatively answered the deliberateness and future dangerousness special issues and negatively answered the statutory mitigation issue at the conclusion of the new punishment hearing (XXX R.R. at 3-8).

On November 6, 2012, the applicant filed his initial application for writ of habeas corpus, cause no. 616522-G, from his 2011 death sentence. The applicant's initial application is currently pending in the state district court.

On October 13, 2013, the Court of Criminal Appeals affirmed the trial court's judgment as to the applicant's 2011 new punishment hearing. *Davis v. State,* No. AP-76,521 (Tex. Crim. App. Oct. 13, 2013)(not designated for publication).

On May 7, 2015, the applicant filed the instant, subsequent application for writ of habeas corpus, cause no. 616522-H.

## II. STATEMENT OF FACTS

The State denies the factual allegations made in the instant application, except those supported by the official records, and offers a summarized statement of facts:

On the evening of August 10, 1991, the applicant, Brian Edward Davis, murdered complainant Michael Foster – an intellectually disabled man – after the applicant and Tina McDonald gave the complainant a ride from the Pik 'N Pak

3

Icehouse to the complainant's apartment. The complainant was seen leaving the icehouse in a red Camaro or Firebird with a man, later identified as the applicant, with a swastika tattoo on his chest and a thin, red-haired woman, later identified as Tina McDonald (XVIII R.R. at 101-11).

When the complainant's body was discovered on August 13, 1991, his jeans were undone with the pockets turned inside-out and he had been stabbed several times; "NSSH" and a swastika were inked on his abdomen and also on the wall (XVII R.R. at 84-5). There was a drinking glass in the toilet, blood in the kitchen, bathroom, and bedroom, and hairs in the complainant's hand and near his body (XVII R.R. at 70-87, 100-2). The complainant's dagger knife and his black leather motorcycle jacket – minus its broken zipper – were missing from the apartment, but the broken zipper from the jacket was in the apartment (XVII R.R. at 171)(XXVII R.R. at 145-7). A flyer was found in the complainant's jeans jacket advertising the band at the Pik 'N Pak, leading to an interview with the icehouse's owner and subsequent identification of the applicant and Tina McDonald as the couple with whom the complainant left on the night of the murder (XVII R.R. at 177-84, 197-201).

On August 17, 1991, a few days after the complainant's murder, the applicant and Tina McDonald were arrested for the attempted murder of Steven Sherman, and McDonald's red Camaro was placed in police impound (XVII R.R.

4

at 186-7)(XCIX R.R. at 57-60). When a friend picked up the red Camaro from police impound, it contained white supremacist literature, a buck knife, a cassette tape, and a black leather jacket minus its broken zipper (XVII R.R. at 207-11)(XVIII R.R. at 119-32).

After the applicant waived his *Miranda* rights, he confessed to the applicant's murder, admitting that he hit the complainant after they arrived at the complainant's apartment on the night of August 10, 1991; that he put a pair of socks on his hands so he would not leave fingerprints; that he hit the complainant with a double-edged knife he found on the dresser; that he grabbed his own knife from his back pocket and started stabbing the complainant who ran out of the bedroom down the hall; that he stabbed the complainant in the chest, side, and back about ten or fifteen times and kicked the complainant with his steel-toed boots; that he turned the complainant's pockets inside-out looking for money; that he forced Tina McDonald to write on the wall to confuse people; and, that he stole a suitcase, the complainant's black leather jacket with a broken zipper, some tapes, a portable television set, and a dagger from the complainant's apartment (XVII R.R. at 226-8).

Dr. Dwayne Wolf, Harris County Deputy Chief Medical Examiner testified that he reviewed the complainant's autopsy report and examined the photos and two knives; that the complainant suffered an abrasion on his cheek and a broken

5

nose, consistent with being struck; that "NSSH" was written in ink on his abdomen; that the complainant suffered a total of fifteen stab wounds; and, that the cause of the complainant's death was multiple stab wounds (XXII R.R. at 6-7, 12-3, 20, 24, 27-8).

## III.

### THE APPLICANT'S CLAIM SHOULD BE DISMISSED FOR FAILURE TO MEET THE REQUIREMENTS OF Tex. Code Crim. Proc. art. 11.071, § 5 FOR THE FILING OF HIS INSTANT, SUBSEQUENT WRIT.

The applicant contends that the State presented false evidence and that his due process rights were violated concerning his confession. Specifically, the applicant alleges that he confessed to the instant offense in exchange for Tina McDonald not being prosecuted for capital murder, and the State withheld information concerning a purported promise.

The applicant attempts to support his claim by relying on a 2004 letter from Charles W. Smith, retired lieutenant of the Humble Police Department, to the Board of Pardons and Paroles opposing parole in Tina McDonald's case. Notwithstanding that the applicant's claim is without merit, *see IV, infra.*, the applicant could have obtained the 2004 letter prior to filing his 2012 initial application and could have presented his claim at that time. Thus, the applicant fails to show that the current claim could not have been presented in his timely initial application filed under art. 11.071 because the factual basis for the claim

6

was unavailable on the date the applicant filed his initial application. *See* TEX. CODE CRIM. PROC. art. 11.071, §5 (a)(1).

The applicant acknowledges that prior to filing his initial application for writ of habeas corpus, cause 616522-G, on November 6, 2012, the Office of Capital Writs:

- obtained and reviewed prior counsel's files, including the Humble Police Department offense report of the complainant's capital murder;

- made "multiple record requests," including with the Harris County Sheriff's Office;

- viewed the Harris County District Attorney's trial file [State's file]; and,

- filed a motion with the trial court to view the entirety of the State's file, including the portion regarding an extraneous aggravated offense, and the trial court granted the motion.

*See applicant's sub-writ at 13; applicant's exhibit 5, affidavit of Kate Pumarejo, Office of Capital Writs.*

The only semi-explanation offered by the Office of Capital Writs for not filing a request under the Public Information Act with the City of Humble prior to filing the initial application is that the Office of Capital Writs "turned its focus to addressing possible errors in the original 1992 guilty conviction" after filing the initial writ on November 6, 2012. *Applicant's sub-writ at 13.* However, the Office of Capital Writs had already "turned its focus" on the original 1992 guilt

7

conviction before filing the applicant's initial application in 2012 as shown by the applicant's first ground for relief in his initial writ alleging that trial counsel were ineffective for failing to present a false confession expert – an issue dealing with the applicant's guilty conviction.[2]

Certainly, the Office of Capital Writs, is aware of and repeatedly utilizes the Public Information Act to request access to documents in many death penalty cases. The applicant can give no reasonable explanation as to why the Public Information Act request to the City of Humble, which produced Detective Smith's 2004 letter, was not filed until March 1, 2013, especially in light of the numerous requests the Office of Capital Writs made to other agencies and persons prior to the filing of the initial writ. Although the applicant argues that there were multiple requests made, implying that the Humble Police Department repeatedly rebuffed the requests, a more accurate statement would be that requests were made to multiple agencies, as acknowledged in the applicant's subsequent application.

Also, the Office of Capital Writs was quickly provided the letter in response to its request – a request not made until almost a year after the initial writ was

---

[2] In fact, the applicant in his subsequent application again presents the affidavit of Gregory DeClue, an affidavit submitted in the applicant's initial 2012 application in an attempt to support his claim of a false confession. However, as demonstrated in the State's response to the applicant's initial writ, a review of the applicant's confession and other evidence shows that the applicant was able to provide details not known by the public; that the applicant's confession was corroborated by physical and eyewitness testimony; and, that the applicant possessed detailed knowledge that would only be known by the person who committed the offense. *State's Reply to First Ground for Relief, Initial Writ, Cause no. 616522-G.*

8

filed. On March 1, 2013, the Office of Capital Writs requested documents from the City of Humble, and, on March 6, 2013, legal counsel for the City of Humble informed the Office of Capital Writs of the legal decision to withhold certain documents. *See State's Writ Exhibit 1-A, March 6, 2013 letter from Donna Johnson, counsel for City of Humble.* However, after the Office of Capital Writs sent another letter on March 22ND, clarifying that it represented the applicant, legal counsel for the City of Humble noted that the City of Humble "has produced the information to which the requestor has a special right of access" in light of the new information. *See State's Writ Exhibit 1-B, April 2, 2013 letter from Donna Johnson, counsel for City of Humble; State's Writ Exhibit 1-C, undated letter from Kate Sauer, Office of Capital Writs.*

Thus, the Office of Capital Writs received the requested information, including Detective Smith's letter, in an expedient manner after the request was made on March 1, 2013, and after the Office of Capital Writs made clear that it represented the applicant – something that it failed to do in its first letter. However, as previously shown, the applicant offers no reasonable explanation why such request could not have been made prior to filing the initial application in 2012, so that the applicant's claim concerning Detective Smith and the 2004 letter could have been presented in his initial application. *See Ex parte Sledge,* 391 S.W.3d 104, 106-7 (Tex. Crim. App. 2013)(holding that defendant failed to show

that factual basis for his subsequent writ claim was unavailable at time of filing initial writ when defendant failed to explain why he was unable to get the information – that the capias for his arrest did not timely issue – prior to filing his initial writ). The applicant fails to meet the requirements of art. 11.071, §5 (a)(1), for the filing of a subsequent application; the applicant fails to show that his current claim could not have been presented in his timely initial application, because the factual basis for the claim was unavailable on the date the applicant filed his initial application.

Notwithstanding the applicant's failure to meet the requirements art. 11.071, §5 (a)(1), the applicant's claim is without merit and should be denied.

## IV.

**IN THE ALTERNATIVE, THE APPLICANT'S CLAIM THAT THE STATE WITHHELD EVIDENCE AND USED FALSE EVIDENCE, VIOLATING HIS RIGHT TO DUE PROCESS, TO OBTAIN HIS 1992 CONVICTION AND HIS 2011 RETRIAL ON PUNISHMENT IS WITHOUT MERIT. THE APPLICANT'S CONTENTION THAT HE CONFESSED BECAUSE OF AN ALLEGED PROMISE IS WITHOUT MERIT AND SHOULD BE DENIED.**

In his instant, subsequent application for writ of habeas corpus, the applicant contends that the State withheld exculpatory evidence and used false evidence to obtain his 1992 conviction and his 2011 verdict on retrial on punishment. Specifically, the applicant contends that State presented alleged false evidence that no promises were made in exchange for his confession. The applicant cites

10

Detective Charles Smith's 2004 letter to the Board of Pardons and Paroles opposing Tina McDonald's parole in an attempt to support his claims. However, Smith's letter to the parole board, although incomplete in the description of events, does not change the fact that a promise was not made to the applicant. While the applicant repeatedly asked for an offer or promise that Tina McDonald would not be prosecuted in the capital offense, no offers, deals, or promises were given. The testimony presented by the State was not false and the State did not withhold exculpatory evidence, i.e., "evidence" of a promise that did not exist.

**1992 MOTION TO SUPPRESS HEARING**

During the 1992 pre-trial motion to suppress hearing, Detective Smith testified that he took photos of the applicant and Tina McDonald in jail on September 10, 1991 [after they were arrested for an extraneous offense]; that he obtained the applicant's hair sample pursuant to a court order on September 16TH; that he obtained Tina McDonald's handwriting sample pursuant to a court order on October 31ST; and, that he obtained a blood sample from McDonald on November 12, 1991 (II 1992 R.R. at 103-15).[3]

On November 19, 1991, Deputy Strickland notified Smith that the applicant wanted to speak with him, so Smith and Detective Bianca went to the jail (II 1992 R.R. at 118). The applicant said he was willing to confess in exchange for

---

[3] Citations to the applicant's 1992 trial will be cited as "1992 R.R." to distinguish them from citations to the applicant's 2011 punishment re-trial.

11

immunity for McDonald (II 1992 R.R. at 119). Smith told the applicant he would have to talk to the District Attorney's Office; he could not tell the applicant that McDonald would not be filed on and he had no authority to grant anyone immunity (II 1992 R.R. at 119) Smith contacted prosecutor Casey O'Brien and reviewed the case and the applicant's proposal with O'Brien (II 1992 R.R. at 120).

On November 21, 1991, the applicant was taken before a magistrate to receive his warnings (II 1992 R.R. at 32-4). Afterwards, O'Brien met with the applicant, Smith, Reserve Detective Hendricks, and Deputy Strickland (II 1992 R.R. at 35). O'Brien, who knew the applicant wanted immunity for McDonald, told the applicant they were not in a position to make any deals; that he would listen to what the applicant had to say; that McDonald's case would be handled appropriately based on the evidence; and, that the applicant could make a statement if he wanted but he did not have to make a statement (II 1992 R.R. at 35). O'Brien, who left before the applicant gave his statement, repeatedly asked the applicant if he wanted to make a statement without any promise and the applicant repeatedly indicated that he did (II 1992 R.R. at 35-6). No one promised the applicant anything in exchange for making his statement (II 1992 R.R. at 129).

During the pre-trial motion to suppress hearing, the applicant acknowledged that he initiated contact with Detective Smith on November 19TH through Deputy Strickland (III 1992 R.R. at 265). According to the applicant, he thought he would

12

get immunity for McDonald in exchange for his statement (III 1992 R.R. at 269).

When asked what Casey O'Brien told him, the applicant testified:

> A. That he could get immunity on a case, but it would all depend on how I made the confession and what I said on the confession that I was giving.
>
> Q. So he didn't guarantee you that you would get immunity automatically. It depended on what you said?
>
> A. Right.

(III 1992 R.R. at 272-3). During cross-examination of the applicant, the following testimony was elicited:

> Q. When you talked to Casey O'Brien right before you made your videotaped confession, did he ever tell you we will give Tina McDonald immunity if you make this confession?
>
> A. He told me depended on what I said on the confession.
>
> Q. Because what he said to you was I can't promise you anything right now. Right now I am making you no promises because I don't know what you are going to say. Is that what he told you?
>
> A. If that's the way you take it. Yes, ma'am.

(III 1992 R.R. at 278).

At the conclusion of the hearing, the trial court denied the applicant's motion to suppress (III 1992 R.R. at 282). Subsequently, the trial court entered written findings of fact and conclusions of law concerning the voluntariness of the

applicant's confession. *State's Writ Exhibit 2-A, trial court's findings re confession.* Specifically, the trial court found that the applicant told Detective Smith he was willing to confess in exchange for immunity for Tina McDonald; that Smith said he could not promise immunity and would talk to an assistant district attorney about it; that prosecutor Casey O'Brien told the applicant that the State was not making any deals or agreements with him and McDonald would be prosecuted if the evidence supported it; that the applicant did not have to make a statement; and, that the applicant stated during his videotaped statement that he had not been promised anything in exchange for his confession. *Id.* at Findings Nos. 6, 11, 14.

## APPLICANT'S 1992 TRIAL

During the applicant's 1992 trial for capital murder which was later reversed on punishment based on *Penry*, evidence was presented that the applicant and his girlfriend Tina McDonald were arrested on August 17, 1991 for an unrelated offense (XV 1992 R.R. at 2720). Detective Smith testified that he was given Tina McDonald's name when he was trying to identify the man and woman with whom the complainant left the icehouse before his murder (XVI 1992 R.R. at 2777-2800). Smith went to the Harris County jail and took photos of McDonald and the applicant, and they were identified as the couple who left with the complainant before his murder (XVI 1992 R.R. at 2802, 2807).

14

Robert Strickland, Harris County Sheriff's Office, jail division, testified that the applicant later contacted him and said he wanted to talk with Detective Smith (XVI 1992 R.R. at 2906)(XVII 1992 R.R. at 2996). Smith testified that he met with Deputy Strickland and then met with the applicant after the applicant initiated the contact (XVII 1992 R.R. at 2814). Smith told the applicant that he would go to the District Attorney's Office and let them know that the applicant was trying to make a deal for immunity for McDonald in exchange for the applicant's confession (XVII 1992 R.R. at 2816). However, Smith never agreed to an immunity deal (XVII 1992 R.R. at 2819).

Prosecutor Casey O'Brien testified that he spoke with Detective Smith on November 19, 1991 and told him that they were not interested in immunity (XVI 1992 R.R. at 2728-31). Subsequently, the applicant was given his magistrate warnings on November 21ST (XVI 1992 R.R. at 2731). O'Brien later met with the applicant and the detectives; O'Brien told the applicant that he knew that the applicant had some concerns about his girlfriend but he would not make a decision about filing any case as to the applicant or his girlfriend (XVI 1992 R.R. at 2734). O'Brien understood that the applicant wanted to give a confession but there would be no advance promises (XVI 1992 R.R. at 2734). The applicant indicated that he understood (XVI R.R. at 2746). After O'Brien left, the applicant gave his videotaped confession (XVI 1992 R.R. at 2823). O'Brien never promised the

15

applicant immunity for McDonald in exchange for his confession (XVII 1992 R.R. at 2971).

**APPLICANT'S 2011 RE-TRIAL ON PUNISHMENT**

During the applicant's 2011 retrial on punishment, Detective Smith testified that he received a phone call on November 19, 1999, and, as a result, Smith met with the applicant who said that he would give a confession in exchange for immunity for McDonald (XVII R.R. at 214)(XVIII R.R. at 83). Smith, who did not talk with the applicant about the facts of the capital murder on November 19TH, made no promises or offers to do anything for the applicant or for McDonald - neither of whom were charged with the instant offense at that time (XVII R.R. at 214, 217)(XVIII R.R. at 36). Smith told the applicant that he could not do anything but he would check with the District Attorney's Office (XVIII R.R. at 83). After Smith left the jail, he contacted prosecutor Casey O'Brien (XVII R.R. at 215).

On November 21, 1999, Smith received a call from the applicant from jail, and the applicant was taken before a magistrate and given his warnings (XVII R.R. at 215-9). After the applicant received his magistrate's warnings, prosecutor Casey O'Brien talked with the applicant in Smith's presence (XVII R.R. at 226). After the magistrate's warnings, the applicant gave a videotaped confession to Detectives Smith and Kelly Hendricks on November 21, 1999, admitting the murder of the

16

complainant (XVII R.R. at 221, 224, 228)(XVIII R.R. at 3). The applicant was not offered or promised anything in exchange for his confession even though the applicant made requests on November 19TH and November 21ST (XVII R.R. at 216, 224-5, 227)(XVIII R.R. at 34). During the videotaped confession, State's Trial Exhibit 103, the applicant agreed that no promises had been made to him concerning his case or McDonald's case (XVIII R.R. at 33).

During Smith's testimony and outside the presence of the jury, trial counsel told the trial court that he wanted to ask Smith about the applicant being very interested in getting immunity for McDonald; that Smith has previously testified that he told the applicant he would talk to the District Attorney about a deal but he could not guarantee it; and, that Smith spoke to prosecutor Casey O'Brien about it and O'Brien said that they could not grant McDonald immunity (XVIII R.R. at 47). Also, outside the presence of the jury, trial counsel acknowledged that there was no promise of immunity made and no promise concerning the applicant being moved to a different location in the jail, but the defense wanted to show the jury that the applicant was asking for those things and wanted to help his wife (XVIII R.R. at 48). The trial court ruled that defense counsel could ask about requests that Smith relayed to others (XVIII R.R. at 51-2).

## SMITH'S 2004 LETTER TO PAROLE BOARD

On June 6, 2004, Detective Smith wrote a letter to the Board of Pardons and Paroles opposing parole for Tina McDonald – who was incarcerated for a crime similar to the instant capital murder.[4] *See applicant's exhibit a.* Smith stated that he investigated the brutal stabbing and subsequent robbery of a mentally challenged male, and that Tina McDonald and her boyfriend Brian Edward Davis became prime suspects in the case. *Id.* Smith stated that evidence led to McDonald's guilt in the capital murder but that DNA testing was not capable of proving facts needed to prosecute her. *Id.* Smith also stated that "[a]fter months of investigation, Davis agreed to confess to the crime in exchange for McDonald not facing prosecution in this case." *Id.*

However, in his May 20, 2015 affidavit, Smith explains that the sentence in his letter is incomplete so it gives a wrong impression. *See State's Writ Exhibit 4-A, May 20, 2015 affidavit of Charles Smith.* Davis first said that he would give a confession in exchange for McDonald not being prosecuted, "but he wasn't able to make that deal because no one would give him that promise or any promise." *Id.* Smith's 2004 letter stating that Davis agreed to confess in exchange for McDonald

---

[4] In the interest of full disclosure, the undersigned Assistant District Attorney and former prosecutor Kelly Siegler wrote a letter to the Board of Pardons and Parole on January 13, 2004, stating that the Harris County District Attorney's Office no longer opposed parole for Tina McDonald who cooperated in the State's efforts to respond to Brian Edward Davis' habeas claim that he was mentally retarded by turning over letters Davis wrote her trying to convince her to falsely assume the greater blame in the capital murder. *See State's Writ Exhibit 3-A, unsigned copy of January 13, 2004 letter to Board.*

18

not being prosecuted was an attempt by Smith to show the Parole Board that McDonald was involved in the capital offense or else Davis would not have said that he would give a confession in exchange for her not being prosecuted. *Id.* However, that statement was incomplete and did not give a full picture of events. In his affidavit, Smith notes that he should have said that Davis agreed to confess in exchange for McDonald not being prosecuted, but no one made that promise and Davis ended up confessing without any promises. *Id.* Davis admitted during his later videotaped confession that he had not been promised anything. *Id.* Smith states that "we knew Davis wanted to make a deal so that McDonald wouldn't be prosecuted but no one ever made any deal with him or promised him anything." *Id.*

Kelly Hendricks, who was a full-time commissioned peace officer in the Humble Police Department in 1991 and who also participated in the investigation of the capital murder, talked with Davis in the jail and was present when Davis gave his videotaped confession. *See State's Writ Exhibit 5-A, May 20, 2015 affidavit of Kelly Hendricks.* Hendricks states that Davis wanted a promise that McDonald would be given immunity or wouldn't be charged in Foster's capital murder, but Hendricks and Smith never made any promises to Davis concerning McDonald or anything else in exchange for his confession. *Id.* Also, when

19

prosecutor Casey O'Brien talked to Davis, he did not make any promises. *Id.* "Davis wanted a promise but he didn't get it."[5] *Id.*

The Humble Police Department and the Harris County District Attorney's Office were aware that the applicant wanted a promise, but he was never made any promises or given any deals concerning Tina McDonald in exchange for his confession. The lack of a promise was repeatedly referred to in testimony during the applicant's 1992 trial and his 2011 punishment retrial and acknowledged by the applicant during his videotaped confession. An inartful sentence in a letter written years after the applicant's 1992 conviction does not change that. The sentence, which does not present the full picture of events, has been subsequently explained and clarified. The applicant was not given a promise in exchange for his confession; instead, the applicant was repeatedly told that there was no promise. *See and cf. Martinez v. State,* 127 S.W.3d 792, 794-5 (Tex. Crim. App. 2004)(holding that for confession to be inadmissible based on promise by law enforcement, promise must be positive, of some benefit to defendant, and of such character as to likely influence defendant to speak untruthfully).

The applicant's case is akin to the situation in *Masterson v. State,* 155 S.W.3d 167 (Tex. Crim. App. 2005), where Masterson was arrested in Florida after

---

[5] Although former prosecutor Casey O'Brien has no independent recollection of the applicant or the case, he reviewed his trial testimony and has no reason to believe that his sworn testimony was untrue or would change in any respect, wherein he testified that no immunity or promises were made. *See State's Writ Exhibit 6-A, May 26, 2015 affidavit of Casey O'Brien.*

20

committing a capital murder in Texas and after leaving the victim's stolen car, containing cocaine, with his nephew in Georgia. Masterson's nephew was subsequently arrested and Masterson gave a confession admitting the Texas capital murder. During the hearing on Masterson's motion to suppress his confession, the detective who took Masterson's statement testified that he told Masterson if the dope in the car was his – not his nephew's – the detective would let someone know that if Masterson wanted to admit it. Masterson claimed that he asked the detective if he could get his nephew's situation taken care of and the detective replied that "he'd see what he could do." *Id.,* at 170. Masterson testified that he understood that to mean that the detective would help him out if he cooperated. *Id.*

The court denied Masterson's motion to suppress, finding that there was no credible evidence to indicate that Masterson was promised anything to make his confession. On direct appeal of his capital murder conviction, Masterson contended that he confessed in return for a promise of leniency for his nephew. However, the Court of Criminal Appeals rejected Masterson's claim and held that the evidence supported an implied finding that the detective made no positive promise to Masterson in exchange for his confession. *Id.* at 170 (citing *Martinez, 127 S.W.3d at 792-3. 795*). The applicant, like Masterson, was not given a promise in exchange for his confession. On the contrary, the applicant was repeatedly told he was not promised anything and he indicated he understood.

21

In the applicant's case, any assertion that Tina McDonald's case would be reviewed and handled appropriately based on the evidence "was not a promise of a benefit in the sense that [applicant] was promised something he would not have otherwise have had." *See Freeman v. State,* 723 S.W.2d 727, 730 (Tex. Crim. App. 1986)(holding that telling defendant that he would not be charged with capital murder after defendant said he wanted to confess but was afraid of getting death penalty was not a promise of benefit where defendant was promised something he would not otherwise have had when the law and facts did not support a charge of capital murder). Regardless of whether the applicant confessed, McDonald's case would be handled in the same way. The evidence concerning McDonald would be reviewed and a decision would be made as to what charges, if any, would be brought against her.

After the evidence against McDonald was reviewed and after the applicant's 1992 conviction, McDonald plead guilty to the offense of attempted murder and aggravated robbery for the stabbing of Steven Sherman with an agreed recommendation that she receive 40 years for the attempted murder/aggravated robbery to run concurrent with 10 years concerning a motion to adjudicate guilt in a non-aggravated offense and that the State would not charge her for the murder of Michael Foster, the complainant in the capital murder. *See applicant's exhibit 2, McDonald's plea papers in cause no. 606934.* As with all pleas made pursuant to

22

an agreed recommendation, the trial judge could have refused to accept the recommendation and McDonald's plea would be withdrawn. The plea agreement was entered based on a review of the available evidence, not because of a non-existent promise to the applicant.

Finally, as previously noted, the applicant argues in his subsequent writ that his confession was false and given because of an alleged, albeit non-existent, promise. The applicant contends that Smith's 2004 letter "calls into question the reliability and veracity of the applicant's confession." *Applicant's subsequent writ at 10.* However, not only did the applicant raise the claim of alleged false confession in his 2012 initial writ application, the applicant erroneously mixes the concept of falseness and voluntariness. As the Court of Criminal Appeals stated in *Martinez,*

> ...the truth or falsity of a confession is irrelevant to a voluntariness determination not only under federal constitutional law but also under state law. Under state law, the determination is whether the officially sanctioned positive promise "would be likely to influence the defendant to speak untruthfully" and not whether, the defendant in fact spoke untruthfully.

*See Martinez,* 127 S.W.3d at 794-5 (quoting *Fisher v. State,* 379 S.W.2d 900, 902 (Tex. Crim. App. 1964)). As shown in the State's Reply to Applicant's First Ground for Relief in the applicant's pending initial application, cause no. 616522-G, the applicant fails to show that his confession was false.

23

The applicant fails to show that the State withheld evidence – a non-existent promise - or used false testimony to obtain his 1992 conviction and his 2011 retrial on punishment; thus, the applicant fails to show that his right to due process was violated. *See and cf. Ex parte Adams,* 768 S.W.2d 281, 292 (Tex. Crim. App. 1989)(holding due process prohibits State from presenting testimony that any member of prosecution unit knows to be false). The testimony at the applicant's motion to suppress hearing, his 1992 trial and his 2011 retrial on punishment consistently and truthfully stated that no promises were given to the applicant in exchange for his confession.

## V. CONCLUSION

Based on the foregoing, the applicant fails to meet the requirements of art. 11071, § 5. The applicant's instant claim could have been presented in his initial applicant for writ of habeas corpus because the factual basis was available at the time his initial writ was filed.

However, in the alternative, and notwithstanding the applicant's failure to meet the statutory requirements of TEX. CODE CRIM. PROC. art. 11.071, § 5 for the filing of a subsequent application for writ of habeas corpus, the applicant's claim is without merit.

24

WHEREFORE, PREMISES CONSIDERED, the State respectfully requests that the Court of Criminal Appeals dismiss the applicant's instant, subsequent application for writ of habeas corpus, based on the applicant's failure to meet the requirements of TEX. CODE CRIM. PROC. art. 11.071, § 5, or, alternatively, deny the applicant's claim based on lack of merit.

Respectfully submitted,


ROE WILSON
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-6657
(713) 755-5240 fax
TBC 14500600
wilson_roe@dao.hctx.net

## VI.

Service has been accomplished by sending a copy of this instrument by mail to counsel for the applicant on this the 3RD day of June, 2015:

Mr. Brad Levenson
Mr. Jeremy Schepers
Office of Capital Writs
1700 N. Congress Ave., Suite 460
Austin, Texas 78701
512 363-8600
512 463-8590 fax

Respectfully submitted,

ROE WILSON
Assistant District Attorney
Harris County, Texas
1201 Franklin, Suite 600
Houston, Texas 77002
(713) 755-6657
(713) 755-5240 fax
TBC 14500600
wilson_roe@dao.hctx.net



# OLSON & OLSON LLP
### ATTORNEYS AT LAW

March 06, 2013

Ms. Kate Sauer
Office of Capital Writs
1700 N. Congress Ave, Ste 460
Austin, Texas 78711

**VIA CMRRR**

Certified Article Number

7196 9008 9111 6505 0086

SENDERS RECORD

RE:   Public Information Request March 01, 2013
       Requestor: **Kate Sauer**
       Ref: COHM13-007

Dear Ms. Sauer:

This letter is in response to your public information request referenced above. Enclosed please find a copy of an opinion we received from the Office of the Attorney General regarding the same information that you have requested. In this instance, we may rely on the attached opinion as a previous determination. We have confirmed with the District Attorney's office that the facts and circumstances of this case have not changed. With the exception of basic front page information and the marked court-filed documents, the remaining records may be withheld. Enclosed are the responsive documents produced in accordance with the attached opinion.

Very truly yours,

**OLSON & OLSON, L.L.P.**

Donna L. Johnson

/dlj
W/Encl.

cc:   Sue Daniel, City Secretary          **VIA E-MAIL**

       Scott Bounds, City Attorney         **VIA E-MAIL**



STATE'S
EXHIBIT
_1A_

WORTHAM TOWER, SUITE 600 | 2727 ALLEN PARKWAY | HOUSTON, TEXAS 77019-2133
TELEPHONE (713) 533-3800  FACSIMILE (713) 533-3888
www.olsonllp.com



# OLSON&OLSON LLP
## ATTORNEYS AT LAW

April 02, 2013

The Honorable Greg Abbott
Texas Attorney General
Open Records Division
P.O. Box 12548
Austin, Texas 78711-2548

**VIA CMRRR**

**Certified Article Number**

7196 9008 9111 6505 1281

**SENDERS RECORD**

RE:    Public Information Request March 01, 2013
Requestor: **Kate Sauer, OCW**
Ref: COHM13-007

Dear Attorney General:

The designated officer for public records, the City Secretary of the City of Humble, Texas, received a public information request March 01, 2013. **[EXHIBIT 1]** The requestor is seeking information pertaining to a specific case involving specific individuals. Your office informed the City that, in this instance, the City may rely on a previous determination **[EXHIBIT 2]** and that, with the exception of basic front page information and marked court-filed documents, the remaining records may be withheld. The City confirmed with the Harris County District Attorney's office that the facts and circumstances of the case had not changed, and timely produced the responsive documents to the requestor in accordance with the opinion. **[EXHIBIT 3]**

On March 22, 2013, the City received a subsequent response from the requestor stating that "the OCW is the attorney of record for the defendant." **[EXHIBIT 4]** In light of the new information, the City has produced the information to which the requestor has a special right of access. In accordance with Texas Government Code § 552.301(e), the City now timely submits this brief or other written comments stating the reasons why the remaining information requested is excepted from disclosure. The City submits for your review the responsive documents attached. **[EXHIBIT 5]**

To the extent the documents contain identifying information of living individuals, such as driver's license numbers, license plate numbers, account numbers and social security numbers, that information is excepted from public disclosure by sections 552.130(a)(1), 552.130(a)(3), 552.136 and 552.147, respectively, and may be redacted without requesting an opinion of the Attorney General. The City contends that the requested information is further excepted from disclosure based on the exceptions to disclosure stated below:

STATE'S
EXHIBIT

**1B**

PENGAD 800-631-6989

## § 552.101. - POLYGRAPH

Section 552.101 of the Government Code excepts from disclosure "information considered to be confidential by law, either constitutional, statutory, or by judicial decision." Gov't Code § 552.101. Section 552.101 encompasses section 1703.306 of the Occupations Code, which provides:

(a) A polygraph examiner, trainee, or employee of a polygraph examiner, or a person for whom a polygraph examination is conducted or an employee of the person, may not disclose information acquired from a polygraph examination to another person other than:

(1) the examinee or any other person specifically designated in writing by the examinee;

(2) the person that requested the examination;

(3) a member, or the member's agent, of a governmental agency that licenses a polygraph examiner or supervises or controls a polygraph examiner's activities;

(4) another polygraph examiner in private consultation; or

(5) any other person required by due process of law.

(b) The [Polygraph Examiners] Board or any other governmental agency that acquires information from a polygraph examination under this section shall maintain the confidentiality of the information.

(c) A polygraph examiner to whom information acquired from a polygraph examination is disclosed under Subsection (a)(4) may not disclose the information except as provided by this section.

Occ. Code § 1703.306. The requestor does not fall into any of the categories of individuals authorized to receive the submitted polygraph information. Accordingly, the City must withhold the information under section 552.101 in conjunction with section 1703.306 of the Occupations Code.

## § 552.101. - CRIMINAL HISTORY RECORD INFORMATION

Further, section 552.101 of the Government Code encompasses laws that make criminal history record information ("CHRI") confidential. CHRI generated by the

National Crime Information Center or by the Texas Crime Information Center is confidential under federal and state law. Title 28, part 20 of the Code of Federal Regulations governs the release of CHRI that states obtain from the federal government or other states. Open Records Decision No. 565 at 7 (1990). The federal regulations allow each state to follow its individual law with respect to CHRI it generates. *Id.* Section 411.083 of the Government Code deems confidential CHRI the Department of Public Safety ("DPS") maintains, except DPS may disseminate this information as provided in chapter 411, subchapter F of the Government Code. *See* Gov't Code § 411.083. Sections 411.083(b)(1) and 411.089(a) authorize a criminal justice agency to obtain CHRI; however, a criminal justice agency may not release CHRI except to another criminal justice agency for a criminal justice purpose. *Id.* § 411.089(b)(1). Other entities specified in chapter 411 of the Government Code are entitled to obtain CHRI from DPS or another criminal justice agency; however, those entities may not release CHRI except as provided by chapter 411. *See generally id.* §§ 411.090-.127. Similarly, any CHRI obtained from DPS or any other criminal justice agency must be withheld under section 552.101 of the Government Code in conjunction with Government Code chapter 411, subchapter F. The responsive information contains CHRI that is confidential under section 552.101 of the Government Code in conjunction with chapter 411 of the Government Code and may be withheld on that basis.

### § 552.130.

Section 552.130 provides that certain information pertaining to motor vehicles is excepted from public disclosure. The statute allows certain information identified in subsections (a)(1) and (a)(3) to be redacted by a governmental body without first seeking an opinion from the Attorney General. However, a governmental body must seek an opinion from the Attorney General when it seeks to withhold information under section 552.130(a)(2). Examples of information excepted from disclosure under this section of the Government Code include a vehicle identification number and license plate number relating to a title or registration issued by an agency of the State of Texas. *See* Open Records Letter Nos. 2000-4847 (2000), 2000-1083 (2000). To the extent these documents contain vehicle identification numbers or license plate numbers, that information is excepted from disclosure under section 552.130(a)(2).

### § 552.134.

Further, the submitted information is excepted from disclosure under section 552.134 of the Texas Government Code. The relevant part of section 552.134 provides that:

(a) Except as provided by Subsection (b) or by Section 552.029 [of the Government Code], information obtained or maintained by the Texas Department of Criminal Justice is excepted from [required public disclosure] if it is information about an inmate who is confined in a facility operated by or under a contract with the department.

Attorney General
April 02, 2013
Page 4

Gov't Code § 552.134. Subsection (b) carves out an exception to disclosure for statistical or other aggregated information relating to inmates or information about an inmate sentenced to death and does not apply in the instant case. Section 552.029 sets forth the required disclosure of certain basic information about an inmate. Neither Subsection (b) nor Section 552.029 apply to the submitted information; therefore, it should be excepted from disclosure.

Thank you for your consideration of this matter. If you should require more information, please do not hesitate to contact me.

Respectfully submitted,

**OLSON & OLSON, L.L.P.**

Donna L. Johnson

/dlj
W/Encl.

cc w/o enclosures:
    Ms. Kate Sauer            **VIA CMRRR**
    Office of Capital Writs
    1700 N. Congress Ave, Ste 460
    Austin, Texas 78711

Certified Article Number

7196 9008 9111 6505 1298

SENDERS RECORD

    Sue Daniel, City Secretary      **VIA E-MAIL**

    Scott Bounds, City Attorney     **VIA E-MAIL**

    Brian Rose, Asst. District Attorney  **VIA E-MAIL**



Office of Capital Writs

Brad D. Levenson
Director

Humble Police Department
Records Division
310 Bender
Humble, TX 77338
recordsdivision@humblepolice.com

To Whom It May Concern:

In response to your letter dated March 6, 2013, Ref: COHM13-007, I would like to provide the following additional information and request that you reconsider which information to allow us access to. The Office of Capital Writs ("OCW") is post-conviction counsel for Brian Davis, convicted of the offense of capital murder regarding offense number #9107975, victim name Michael Foster. As the OCW is the attorney of record for the defendant in this offense, the background information that was relied upon in the Attorney General's prior opinion should not be considered controlling.

In addition, as counsel for Mr. Davis the OCW has a legal right to access of information which "would tend to exculpate him." *Brady v. Maryland*, 373 U.S. 83, 88 (1963). This includes information that could be used to impeach witnesses against Mr. Davis. *United States v. Bagley*, 473 U.S. 667, 684 (1985). Included within this duty is the "disclosure of favorable evidence known only to the police." *Harm v. State*, 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). The OCW believes that such exculpatory and/or impeachment evidence exists in the requested file, and that as counsel of record for Mr. Davis the OCW has a legal right to access it. Failure to provide this evidence is grounds for reversal of a defendant's conviction. *Ex parte Richardson*, 70 S.W.3d 865, 873 (Tex. Crim. App. 2002).

As such, pursuant to the Texas Public Information Act, §6252-17a et seq., I am re-requesting to view the file for offense number #9107975, victim name Michael Foster, in its entirety and the ability to make copies of its contents. More specifically, I am requesting all documents and records contained in this file to be made available.

Stephen F. Austin Building
1700 N. Congress Avenue, Suite 460 • Austin, Texas 78711
Phone (512) 463-8600 • Fax (512) 463-8590

STATE'S
EXHIBIT
1C

PENGAD 800-631-6989

For the purposes of this request, the terms "records" and "documents" are intended to include, without limitation, any and all written, typed, printed, recorded, graphic computer-generated, or other matter of any kind from which information can be derived, whether produced, reproduced, or stored on paper, cards, tapes, films, electronic facsimiles, computer storage devices, or any other medium. They include, without limitation, police reports, witness statements, letters, memoranda (including internal memoranda), calendars, schedules, books, indices, notes, printed forms, publications, press releases, notices, minutes, summaries or abstracts, reports, files, transcripts, computer tapes, printouts, drawings, photographs, recordings (including both videotapes and audiotapes), telegrams, and telex messages, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing marginal notations.

Please note that the OCW is a state agency, and to the extent that you do not charge state agencies for copies, we respectfully request that the records be provided at no charge. If, however, you anticipate there will be a fee charged for copies of these records, please contact me before proceeding to copy any materials.

The Texas Public Information Act requires that you "promptly produce" the requested records unless, within 10 days, you have sought an Attorney General's Opinion. If you expect a significant delay in responding to this request, please contact me with information about when I might expect copies or the ability to inspect the requested records.

Thank you for your time and effort in gathering these records.

Sincerely,

Kate Sauer
Post-Conviction Attorney
Office of Capital Writs
1700 N. Congress Avenue, Suite 460
Austin, Texas 78711
Phone (512) 463-8600
Fax (512) 463-8590
Kate.Sauer@ocw.texas.gov

CC    Donna Johnson at djohnson@olsonllp.com
      Kevin Keating at KEATING_KEVIN@dao.hctx.net

APR 25 1994

Time: _____

Harris County, Texas

By _____
Deputy

District Clerk

NO. 616522

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT |
| V. | § | OF HARRIS COUNTY, TEXAS |
| BRIAN EDWARD DAVIS | § | 230th JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW CONCERNING THE VOLUNTARINESS AND ADMISSIBILITY OF THE DEFENDANT'S VIDEOTAPED ORAL CONFESSION

On the eighteenth and nineteenth of May, 1992, came to be heard at a pretrial hearing the defendant's Motion for Hearing on Voluntariness of any Admission or Confession Whether Written or Oral. This hearing was had in open court. The court reporter, assistant district attorney, defendant, and his counsel were present at all times and there was no request by the defendant at any time for any delay. The Court heard evidence adduced before it bearing upon the facts and circumstances surrounding the video-tape recording of the defendant's alleged confession.

At the conclusion of said hearing, the Court having observed the manner and demeanor of the witnesses and without regard to the truth or falsity or the materiality of the content of said confession and the Court having in no way limited the evidentiary offerings and arguments of the defendant at said hearing, the Court finds from the evidence beyond a reasonable doubt, as a matter of law and fact, that the defendant's videotape-recorded conversation with law enforcement officers was voluntary and is admissible





RECORDER'S MEMORANDUM:
This instrument is of poor quality
and not satisfactory for photographic
recordation; and/or alterations were
present at the time of filming.

STATE'S
EXHIBIT
2A

against him in evidence. In support of the Court's action, the Court finds the following facts:

1) On August 17, 1991, the defendant and Tina McDonald were arrested by Houston police officers in connection with the stabbing of Steven Sherman. Counsel was appointed to represent the defendant in that case on August 19, 1991.

2) On September 10, 1991, Humble Police Department Detectives Charles Smith and Kelly Hendricks went to the Harris County Jail to photograph the defendant and Tina McDonald for use in photospreads in this case, the capital murder of Michael Alan Foster. Shown a photograph of Foster by the detectives, the defendant denied that he knew him and said he wanted to talk to the attorney appointed to represent him in the Sherman case. The detectives ceased their conversation with the defendant and left.

3) On September 16, 1991, a court order to obtain hair samples from the defendant was executed by Detectives Smith and Hendricks. They did not engage the defendant in conversation about the facts of this case.

4) On October 30, 1991, the defendant appeared in district court for his scheduled appearance on another pending felony charge. At that time, Mr. Davis' counsel, Terry Gaiser, informed Det. Smith that the defendant did not wish to meet with Det. Smith and that Mr. Gaiser wanted to be present if Det. Smith wanted to question the defendant.

5) On November 19, 1991, the defendant contacted Harris County Sheriff's Deputy Robert Strickland and expressed a desire to talk with Det. Smith about this case.

6) Det. Smith met with the defendant at the jail that same day and asked him if he wanted his court-appointed lawyer to be there during the meeting. The defendant replied that he did not want his lawyer to be present. The defendant then told the detective he was willing to confess to this crime in exchange for immunity for Tina McDonald. Det. Smith advised the defendant he could not promise immunity for

2

her, and would talk to an assistant district attorney about it. The defendant also told Det. Smith that he wanted a transfer out of administrative segregation at the Harris County Jail facility at 701 N. San Jacinto.

7) Det. Smith telephoned Mr. Casey O'Brien, an assistant district attorney for Harris County, and told him about the defendant's proposal.

8) On November 21, 1991, the defendant was taken by Detectives Smith and Hendricks and Dep. Strickland to the courtroom in the jail for the purpose of being advised of his legal rights by the magistrate.

9) Judge Carol Carrier advised the defendant at 6:50 p.m. on November 21, 1991, of his right to retain counsel, his right to remain silent, his right to have an attorney present during any interview with peace officers or attorneys representing the State, his right to terminate an interview with peace officers or attorneys representing the State at any time, his right to request the appointment of counsel if he were indigent and could not afford counsel, his right not to make a statement, and the fact that any statement he made would probably be used against him in his trial.

10) The defendant, the detectives, and Dep. Strickland then went to Strickland's office in the jail; Casey O'Brien arrived shortly.

11) While the videotape equipment was being set up, Mr. O'Brien spoke with the defendant about the legal warnings. He also told the defendant that the State was not making any deals or agreements with him, that Tina McDonald would be prosecuted if the evidence supported it, and that the defendant did not have to make a statement.

12) At the time that Casey O'Brien met with the defendant, O'Bryan was aware that the defendant had counsel in another pending case. At no time did Det. Smith or O'Bryan attempt to contact defendant's counsel in that case.

13) The video camera was turned on, and Det. Smith orally advised the defendant again of his legal rights, including his right to counsel, his

3

VI222 P.0413

right to have his attorney present during the interview, his right to terminate the interview at any time, and his right not to make any statement.

14) The defendant understood his rights; and freely, voluntarily, knowingly, and intelligently waived each of these rights on the videotape. The defendant also stated to the detectives on the tape that he did not want his lawyer to be present, that he had not been promised anything in exchange for his statement, and that he had not been pressured or forced into making a statement.

15) The defendant then made an oral confession to this crime, as reflected on the videotape. The defendant was not handcuffed during the confession; he was served coffee and was allowed to smoke, as reflected on the tape.

16) The defendant stated both at the beginning and near the end of the videotape that he had initiated contact with the law enforcement officers for the purpose of giving a statement.

17) The defendant further stated near the end of the videotape that he gave the statement voluntarily, and that he realized this was a capital murder case with a maximum punishment of "lethal injection."

The Court therefore concludes, after having carefully observed the demeanor and manner in which each witness testified, and after having seen the videotaped confession, that the defendant's confession which was made to Humble Police Detectives Charles Smith and Kelly Hendricks on November 21, 1991, was made freely and voluntarily without threats, improper influence, any promises, persuasion or compulsion, or any police misconduct of any kind, and after the defendant knowingly and intelligently waived the presence of counsel and his right to remain silent. The Court, therefore,

4

further concludes that the defendant's confession is admissible in evidence against him.

ENTERED this _____ day of APR 25 1994 _____, 1994.

_____
HON. JOE KEGANS, JUDGE
230th District Court
Harris County, Texas

5

V I222 P0415



## CHARLES A. ROSENTHAL, JR.
### DISTRICT ATTORNEY
### HARRIS COUNTY, TEXAS

January 13, 2004

Texas Department of Criminal Justice
Board of Pardons and Paroles Division
NTO Protest Desk
P. O. Box 13401, Capitol Station
Austin, Texas 78711

Re: Tina McDonald, TDCJ No. 648346, 230TH District Court, Harris County

Dear Members of the Board of Pardons and Paroles,

I am in receipt of your most recent parole notice for the above-referenced inmate. The Harris County District Attorney's Office no longer opposes parole for Tina McDonald. Further, inmate McDonald has cooperated with the Harris County District Attorney's Office concerning our office's efforts to respond to the habeas allegations of her co-defendant Brian Edward Davis. Davis, who was assessed the death penalty in the 230TH District Court of Harris County, is presently contending that he is mentally retarded and his scheduled execution was stayed in order to address such claim. Inmate McDonald has provided our office with letters written to her by Davis where Davis intelligently and persuasively, albeit unsuccessfully, attempts to convince McDonald to falsely assume the greater blame for their offense.

Inmate McDonald's other efforts at rehabilitation while incarcerated are best left for the Board to consider and evaluate. However, if the Board has questions concerning McDonald's cooperation with our office, please call me at (713) 766-5168 or Roe Wilson at (713) 755-6657.

Sincerely,


Kelly Siegler
Assistant District Attorney
Harris County, Texas


ROE WILSON
Assistant District Attorney
Harris County, Texas

1201 Franklin Street, Suite 600, Houston, Texas  77002-1923



STATE'S
EXHIBIT
3A

BRIAN EDWARD DAVIS
CAUSE NO. 616522-H
230th DISTRICT COURT

## **AFFIDAVIT**

Before me, the undersigned authority, a Notary Public in and for San Augustine County, Texas, on this day personally appeared Charles Smith, who being by me duly sworn, upon his oath deposes and says:

"My name is Charles Smith. From July 17, 1981 to April of 2005, I was a peace officer with the Humble Police Department. In 1991, I was the lead investigator in the capital murder of Michael Foster. During the investigation, Kelly Hendricks, also with Humble P.D., and I spoke with Brian Edward Davis who was in jail after being arrested for another offense. Davis' girlfriend Tina McDonald was also in jail after being arrested for the same offense.

At first, Davis said he would give a confession in the capital case if he was promised that McDonald wouldn't be prosecuted in the case, but Davis was never given any promises, including about anything concerning Tina McDonald. Hendricks and I made no promises to Davis in exchange for his confession. Prosecutor Casey O'Brien went to the jail to talk to Davis, and O'Brien didn't promise Davis anything in exchange for a confession. We


STATE'S EXHIBIT
4 A

knew that Davis wanted to make a deal so that McDonald wouldn't be prosecuted but no one ever made any deal with him or promised him anything in exchange for his confession. When Davis later confessed, he admitted during the videotaped confession that he had not been promised anything.

McDonald was prosecuted for the offense for which she was arrested, and, in 2004, I wrote a letter to the Board of Pardons and Paroles objecting to her being paroled. In the letter, I said that "Davis agreed to confess to the crime in exchange for McDonald not facing prosecution." That sentence it true but it is incomplete so it gives a wrong impression. As I said before, Davis did say at first that he would confess in the capital murder case in exchange for McDonald not being prosecuted in the case, but he wasn't able to make that deal because no one would give him that promise or any promise. What I was trying to convey to the Parole Board was that McDonald was involved in the capital murder or Davis wouldn't be asking for this. My thinking was that McDonald's involvement in the capital and her committing the other crime where someone was stabbed meant that she shouldn't be paroled. I should have said that "Davis first agreed to confess to the crime in exchange for McDonald not facing prosecution, but no one

2

would make him that promise and he ended up confessing without any promises being made to him."

I have read the above statement and find it to be true and correct to the best of my knowledge."

_____
CHARLES SMITH
Affiant

SWORN AND SUBSCRIBED before me, under oath, on this the 20 day of May, 2015.

_____
NOTARY PUBLIC in and for the
State of Texas

My commission expires: 11/12/16

SANDRA K. McGEE
Notary Public
STATE OF TEXAS
My Comm. Exp. Nov. 12, 2016

3

Cause No. 616522

EX PARTE                          §   IN THE 230TH DISTRICT COURT

                                  §   OF

BRIAN EDWARD DAVIS,               §   HARRIS COUNTY, TEXAS
Applicant


<u>**AFFIDAVIT**</u>

STATE OF TEXAS                    §        DATE: May 20th, 2015

HARRIS COUNTY                     §


Before me, the undersigned authority, a Notary Public in and for Harris County, Texas, on this day personally appeared Kelly Hendricks, who being by me duly sworn, upon his oath deposes and says:

"My name is Kelly Hendricks. I am a full-time commissioned peace officer presently assigned to the Internal Affairs division of the Montgomery County Sheriff's Office. From September, 2002 to present, I was a full-time commissioned peace officer with the Humble Police Department from August 1982 through August 2002. As part of my duties at the Humble Police Department, I participated in the investigation of the 1991 capital murder of Michael Foster. After Brian Edward Davis was arrested in connection to another case, he ended up giving a confession admitting the capital murder of Foster.

Davis wanted a promise that his wife/girlfriend Tina McDonald, who was arrested along with Davis in the other case, would be given immunity or wouldn't be charged in Michael Foster's capital murder. However, Charles Smith and I never made any promises to Davis concerning McDonald or anything else in exchange for his confession. I was present when Casey O'Brien, a prosecutor with the Harris County D.A.'s Office, talked to Davis, and Casey O'Brien made no promises to Davis.



STATE'S
EXHIBIT
**5A**

Davis wanted a promise but he didn't get it. In fact, during his videotaped confession, where I was present along with Charles Smith, Davis agreed that he had not been promised anything in return for his confession.

I have read the above statement and find it to be true and correct to the best of my knowledge."



KELLY HENDRICKS
Affiant

SWORN AND SUBSCRIBED before me, under oath, on this the 20th day of May, 2015.

NOTARY PUBLIC in and for the
State of Texas

My commission expires: July 29, 2018

BETTY CLARKE
MY COMMISSION EXPIRES
JULY 29, 2018

2

**THE STATE OF MISSOURI**                    )(

                                             )(                    **AFFIDAVIT**

**COUNTY OF HOWELL**

My name is Casey O'Brien. I am a retired Assistant District Attorney of Harris County, Texas, now residing in the state of Missouri.

I have been asked to provide an affidavit concerning my official actions and conversations in 1991 with one Brian Davis then suspected of having committed a capital murder in Humble, Texas. Specifically whether I agreed, in exchange for his confession, to immunize his girl friend, Tina McDonald or made some other promises concerning the disposition of his case or person.

In an attempt to aid my recollection of events that occurred some 24 years ago, I have reviewed my testimony from the 1992 trial. I still have no independent recollection of this individual or the facts of the case, but I have no reason to believe that my sworn testimony then was untrue or would change in any respect, wherein I testified that no immunity or promises were made to Mr. Davis though I did apparently speak to him. I then advised the police detective to take Davis immediately before a magistrate prior to seeking any confession or admissions. I had no further involvement in the prosecution of Mr. Davis.

_____
**Affiant**

Sworn to and subscribed before me on this the 26ᵀᴴ day of May, 2015.

_____
**Notary public**
**Howell County, Missouri**

CASEY SCOTT
NOTARY PUBLIC - NOTARY SEAL
STATE OF MISSOURI
BOONE COUNTY
MY COMMISSION EXPIRES NOV. 18, 2016
COMMISSION #12415646



STATE'S
EXHIBIT
6A
PENGAD 800-631-6989